

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-22-00743-CR

Sylvia **COVARRUBIAS-MONTES**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 365th Judicial District Court, Maverick County, Texas
Trial Court No. 20-11-08163-MCRAJA
Honorable Amado J. Abascal III, Judge Presiding

Opinion by:    Lori Massey Brissette, Justice

Sitting:    Rebeca C. Martinez, Chief Justice
Lori I. Valenzuela, Justice
Lori Massey Brissette, Justice

Delivered and Filed: March 31, 2025

AFFIRMED

Appellant Sylvia Covarrubias-Montes was convicted of theft of more than $2,500 but less than $30,000. Based primarily on her position that the State failed to satisfy its duty to investigate and produce exculpatory evidence from a third party, she challenges her judgment of conviction. We affirm.

**BACKGROUND**

Covarrubias-Montes was the accounting supervisor for two companies owned by Eduardo Castañeda Gonzalez involved in the import and export of products between Mexico and the United States: "CA-RI Autotransports, LLC" and "CA-RI Autotransportes, S.A."[1] Between 2017 and 2019, Covarrubias-Montes allegedly wrote, signed, and cashed checks that were made without authorization, unlawfully appropriating money from those companies. On November 16, 2020, she was charged by indictment for the offense of theft of more than $2,500 but less than $30,000. TEX. PENAL CODE § 31.03(e)(4)(A) (state jail felony).

Prior to trial, Covarrubias-Montes filed several motions seeking the discovery and production of documents by the State, specifically accounting records of both companies—records she maintained should be available based on her experience working for the companies. The State sought the documents, but in the end could not obtain a few of the items requested by Covarrubias-Montes. Ultimately, Covarrubias-Montes' counsel accepted the State had furnished all documents in its possession. During trial, Eduardo Castañeda Rivero—complainant's son and also part owner of the companies—testified the State had not asked him to produce certain documents that may be available. A few days later, Covarrubias-Montes moved for a mistrial on that basis, which was denied.

A jury found Covarrubias-Montes guilty on July 13, 2022, and the trial court sentenced her to twenty-one months in state jail, suspended her sentence, placed her on community supervision for five years, fined her $2,625, and ordered her to pay restitution in the amount of $26,254.04. Covarrubias-Montes moved for a new trial, which was denied. On appeal, Covarrubias-Montes

---

[1] For ease of reference, CA-RI Autotransports, LLC is referred to as "the American company" and "CA-RI Autotransportes, S.A." is referred to as "the Mexican company."

argues the evidence was insufficient to support her conviction. She further asserts the trial court erred by (1) improperly limiting the State's discovery obligations under Texas Code of Criminal Procedure Article 39.14, (2) denying her motion for mistrial, and (3) denying her motion for new trial. Finally, she contends her counsel was ineffective and that the evidence was insufficient to support her conviction.

## SUFFICIENCY OF THE EVIDENCE

Covarrubias-Montes argues the evidence was insufficient to prove she was guilty of theft in the amount of $2,500 or more but less than $30,000.[2] Specifically, she contends no rational jury could have found her guilty because the credibility of witnesses "could not be rationally considered" without a forensic audit to detect theft. She contends that, without the audit, the trial devolved into one of "personalities" when there should have been "a higher standard of evidentiary support" based on contemporaneous business records.

### A. Standard of Review and Applicable Law

In reviewing the sufficiency of the evidence, we will consider the evidence in the light most favorable to the verdict to determine whether a rational juror could have found Covarrubias-Montes guilty beyond a reasonable doubt based on proof of the essential elements of the offense charged. *Baltimore v. State*, 689 S.W.3d 331, 341–42 (Tex. Crim. App. 2024). We will not disturb the trier of fact's full responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, to determine the credibility of witnesses, and to draw reasonable inferences based on the evidence presented. *Id.* at 341–42.

---

[2] Covarrubias-Montes also challenges the sufficiency of the evidence as to the lesser-included offense of theft in the amount of $750 or more but less than $2,500, but the jury solely found her guilty of the offense of theft in the amount of $2,500 or more but less than $30,000. We therefore decline to address the sufficiency of the evidence supporting the lesser included offense. *See* TEX. R. APP. P. 47.1.

Jurors are permitted to draw reasonable inferences from the evidence presented at trial, so long as each inference is supported by evidence. *Id.* They "may use common sense, common knowledge, personal experience, and observations from life when drawing those inferences." *Id.* They are not allowed, however, to come to conclusions based on speculation. *Id.*

When determining sufficiency, we will compare the evidence presented to the essential elements of the offense as defined by a hypothetically correct jury charge. *Id.* at 341. A hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense." *Id.*

"The essential elements of theft include the statutory elements as laid out in Texas Penal Code § 31.03(a) 'as modified by the charging instrument.'" *Lang v. State*, 664 S.W.3d 155, 174 (Tex. Crim. App. 2022) (quoting *Alfaro-Jimenez v. State*, 577 S.W.3d 240, 244 (Tex. Crim. App. 2019)). The statutory elements of theft require proof that (1) a person; (2) with the intent to deprive the owner of property; (3) unlawfully appropriates that property. *Lang*, 664 S.W.3d at 166. However, "the essential elements of the hypothetically correct jury charge include more than the mere statutory elements." *Id.* at 169. The Court of Criminal Appeals has identified the essential elements of theft as: (1) the identity of the property owner, (2) the value or range of value of the stolen property, (3) the description of the stolen property, (4) the name, kind, and number of the property, where known and, if unknown, a general classification describing and identifying the property as much as possible. *Id.* at 174–75. "The law authorized by the indictment 'includes the statutory elements of the offense and those elements as modified by the indictment.'" *Id.* at 168–69 (quoting *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018)).

Based on the statutory elements of theft and the elements included in a theft charging instrument, the hypothetically correct jury charge in this case would allege Covarrubias-Montes unlawfully appropriated "assorted merchandize, including U.S. Currency"—valuing greater than $2,500 but less than $30,000—with the intent to deprive the owner, Eduardo Castañeda Gonzalez, of said property. *Lang*, 664 S.W.3d at 174–75. Viewing the evidence in the light most favorable to the jury's verdict, we must determine whether any rational trier of fact could have found Covarrubias-Montes guilty of theft beyond a reasonable doubt. *See id.* at 175.

## B. The Evidence Presented at Trial

Turning to the evidence presented at trial, the State introduced a series of checks and deposit slips during the testimony of Ricardo Salazar—a former detective for the Eagle Pass Police Department—who testified he investigated Covarrubias-Montes's theft in April 2019 after it was reported to him by Eduardo Castañeda Rivero. The checks and deposit slips showed the following transactions in the Eagle Pass-based IBC bank accounts of the American and Mexican companies:

- Salary Increases: From approximately February 2017 through April 2017 Covarrubias-Montes wrote and signed approximately twelve checks of $450—$46.43 above her net salary—payable to herself from the IBC bank account of the American company. From approximately April 2017 through March 2019 Covarrubias-Montes wrote and signed more than ninety checks of $535.28—$131.71 above her net salary—payable to herself from the IBC Bank Eagle Pass account of the American company.

- Bonus: Covarrubias-Montes wrote and signed a bonus check in December 2018 for $2,416.31.

- Advances from the American company: Covarrubias-Montes wrote and signed checks payable to herself for advances of $200 in August 2017, $400 in October 2017, and $300 in September 2018 from the IBC Bank Eagle Pass account of the American company.

- Loans from the American company: Covarrubias-Montes wrote and signed checks payable to herself for loans for $400 in March 2017, $1,070.56 in July 2017, and $2,500 in May 2018 from the IBC Bank Eagle Pass account of the American company.

- Loans from the Mexican company: Covarrubias-Montes wrote and signed checks payable to herself from the IBC Bank Eagle Pass account of the Mexican company for loans of $1,000 in July 2018, and $600 in August 2018.[3]

- Advances from the Mexican company: Covarrubias-Montes wrote and signed checks payable to herself from the IBC Bank Eagle Pass account of the Mexican company for advances of $600 in July and October 2018, and January 2019.

Salazar testified he estimated Covarrubias-Montes unlawfully appropriated approximately $28,000. On cross-examination, Salazar explained he referred the case for prosecution based on his review of the checks, and his interviews of Covarrubias-Montes, Eduardo Castañeda Gonzalez, and his children—Eduardo Castañeda Rivero and Paola Castañeda. He testified he conducted no additional investigation and sought no additional business records evidence.

Eduardo Castañeda Gonzalez—the primary owner of both the American and the Mexican companies—testified he hired Covarrubias-Montes. In 2016, while working for the Mexican company, Covarrubias-Montes asked Castañeda Gonzalez to commence paying her through the American company because she had U.S. residency and wanted to establish she was working and earning wages in the United States. In 2019, after the American company was delayed in making its loan payments for their commercial trucks to IBC Bank, the bank contacted him. It was around this time Covarrubias-Montes also stopped providing him with company financial statements. As a result, he asked Paola Castañeda to conduct an internal review of both companies. Covarrubias-Montes resigned when the review turned to the accounting department under her management.

The results of the review revealed Covarrubias-Montes's unauthorized checks. Castañeda Gonzalez testified he did not authorize Covarrubias-Montes's salary increases, loans, or advances. However, he conceded he never personally signed company checks and Covarrubias-Montes often

---

[3] Salazar testified an additional check for $800 in August 2018 and payable to Covarrubias-Montes was signed by Castañeda Rivero because he would occasionally sign blank checks and provide them to Covarrubias-Montes to be used for the payment of business expenses.

acted to both write and authorize checks in her capacity as accounting manager. He further testified he has not recovered any of the money taken by Covarrubias-Montes.

When questioned why his son, Castañeda Rivero, signed some of the checks reflecting Covarrubias-Montes as payee for loans, advances, and salary, he testified Castañeda Rivero would not write the checks, he would just sign them, and leave it to Covarrubias-Montes to complete the other necessary information. He further explained he did not authorize checks written and signed by Covarrubias-Montes to herself. He also testified that other than drivers, employees did not normally receive bonuses.

Paola Castañeda testified she never worked for either company but provided them audit services. She testified she conducted the 2019 internal review of the American company to determine what hindered the company financially. She also testified Covarrubias-Montes instructed an American company employee to not provide any company financial information to assist in the review. According to Castañeda, Covarrubias-Montes's gross salary was $450, with a net salary of $403.57, and checks above that amount were unauthorized salary increases. She calculated the unauthorized checks totaled approximately $36,000. On cross-examination, she testified she knew Covarrubias-Montes misappropriated funds because of "irregularities" including 2017, 2018, and 2019 profit and loss statements showing losses during Covarrubias-Montes's tenure, including the exclusion of unpaid company loans and salary advances above Covarrubias-Montes's W-2 reported salary. Castañeda testified Covarrubias-Montes did initially participate in the review but later expressed her lack of agreement with it to Castañeda Gonzalez and ceased all cooperation after Castañeda asked Covarrubias-Montes for bank statements for both companies in April 2019. Castañeda conceded on cross-examination her report of her findings did not include any reference to a diversion of funds or check forgeries. She also admitted her brother

signed some of the checks, but she explained the checks were unauthorized. She conceded a debt schedule showed Covarrubias-Montes made payments on her loans and advances, but she testified Covarrubias-Montes never finished paying her debt.

Eduardo Castañeda Rivero testified Covarrubias-Montes controlled accounting for both companies and did not permit him access to accounting records. He acquiesced to her refusal because Covarrubias-Montes provided a monthly company financial statement. He further testified he did not authorize Covarrubias-Montes's 2017 salary increases over her net salary of $403.57. When asked about multiple checks he signed reflecting the salary increase, he explained Covarrubias-Montes would ask him to sign blank checks in order to proceed with payments of certain business expenses in advance of Castañeda Rivero being out of the office for a few days. On cross-examination, he was asked why he would need to leave blank checks for Covarrubias-Montes if she could sign the checks herself, and he explained he assumed she had a good reason for it and trusted her.

Comparing the checks to Covarrubias-Montes for loans and advances on salary with the corresponding payroll checks, Castañeda Rivero testified there were no deductions for payments of loans or advances made to Covarrubias-Montes in subsequent checks. He further testified he did not authorize certain checks lacking a memo description: $550 in October 2016, $600 in January 2019, and a $400 check he signed in October 2018. Castañeda Rivero also testified Covarrubias-Montes had two accountants working for her, Guadalupe de la Cruz and Yesenia Martinez. On cross-examination, he agreed if he really wanted to know whether the checks were authorized, he would have spoken to de la Cruz and Martinez because they were authorized by Covarrubias-Montes to process the checks. He further acknowledged there was no belief at the time of the internal review that any irregularities were the result of theft.

Covarrubias-Montes testified the American company paid her a salary of $450 per week. She also testified she received a raise to make her net salary $535.28 in 2017. She testified she wrote her own checks because she had authorization to do so. She also testified every bonus, loan, or advance was approved by Castañeda Rivero. When she received loans or advances, they were approved by Castañeda Rivero as witnessed by an accounting employee.[4] And when she cashed her next payroll check, she paid the loan or advance. She testified it was done this way because she had no authorization to approve loans or advances; she further testified she had no authority to order the accountant to process a loan or advance and never bribed anyone to secure one. Further, she stated she believed that if she violated those rules accounting was required to inform Castañeda Rivero.

She conceded the internal review started because IBC Bank had not received payments on the bank loan, she was aware of the missed payments when they occurred, and the American company owed the bank $24,000 in missed payments. She testified she participated in the internal review including several personnel meetings and attended all meetings to which she was invited. She reviewed the report resulting from the internal review, and observed it stated no anomalies were detected, only areas for improvement. She denied ever refusing to provide the Castañedas access to company information. She also testified she cooperated fully with Salazar's investigation, going to the police department on her own to answer his questions and providing him with people to speak to including the Montemayor bookkeeping.[5] She further testified she fell and broke her arm in April 2019, was later advised by a doctor to stop working, and was fired

---

[4] She testified Castañeda Rivero's approval was also occasionally secured by simply having him sign checks. On other occasions, he would verbally approve.

[5] Montemayor bookkeeping is alternatively referred in the record as "Montemayor accounting" or the "external bookkeeper."

shortly thereafter. She also testified Castañeda Gonzalez became angry with her because of a dispute involving whether she lawfully purchased a car from the company or stole it.

Yesenia Martinez Apolinar testified she worked for both companies from February 2016 to October 2018 as an accounting assistant for debts, payroll, human resources, billing, receivables, revenue, and operations supervision. She testified salary increases had to be authorized by Castañeda Rivero for assistants, and by Castañeda Gonzalez for administrators, which included Covarrubias-Montes—who was an administrative manager. For a salary increase for Covarrubias-Montes, she explained the process as follows (1) a meeting would take place, (2) Castañeda Gonzalez would authorize a raise amount at the meeting, (3) Martinez Apolinar would be informed of the raise amount, and (4) she would be required to provide the information to Montemayor accounting to secure tax calculations for payroll. The checks would then be processed by the managing department, including herself and Covarrubias-Montes. Checks were then signed by Covarrubias-Montes or Castañeda Rivero only. They would then be duplicated and entered into an Excel spreadsheet. Castañeda Gonzalez and Castañeda Rivero were responsible for authorizing loans to Covarrubias-Montes as well as bonuses and salary increases more generally.

She further testified if she received a loan that had not been authorized, she would have to check to confirm authorization. Once the loan was made, it was registered as a debt in accounting. She said she never allowed a loan check to be made and negotiated without authorization from Castañeda Gonzalez or Castañeda Rivero. She believed Castañeda Rivero was always informed of all transactions in the company. If she suspected a transaction was not authorized, she would have reported it to Castañeda Rivero. And in any event, because the companies are small, everyone was aware of company transactions.

She never detected any fraud by Covarrubias-Montes with respect to salary increases, loans, or advances. But she conceded she did not have access to bank accounts. And she testified leaving check memos blank was rare, but it did happen. She did testify it was not normal for a check to be signed and otherwise left blank to be filled in later.

Martinez Apolinar testified loans to Covarrubias-Montes were accounted for and that Covarrubias-Montes occasionally paid for her advances by depositing funds in the bank instead of through payroll deductions. The payments were verified through the debt schedule. She testified each of the checks shown to her by the State were authorized by the company. She further testified Covarrubias-Montes's payroll checks, which increased from $403.50 net salary to $450 and then to $535.28, were the result of raises in Covarrubias-Montes's salary authorized by Castañeda Gonzalez during meetings with Castañeda Gonzalez and Castañeda Rivero. She also testified it was "normal procedure" for someone to receive more than one raise within three months, stating several employees did because of performance. She further testified Christmas bonuses and vacation payments were also authorized by Castañeda Rivero.

On cross-examination, Martinez Apolinar testified Covarrubias-Montes, and separately her attorneys, contacted her to testify and she chose to come of her own volition. She further testified her sister had previously worked for the company but had resigned. Martinez Apolinar testified she herself resigned because of stress and because she opened a gift shop business. Castañeda Rivero complained about her use of her work hours for her business.

Gabriela Ariceaga Navarro testified she worked for Montemayor accounting from 2013 to 2017 as an administrator in the receivables department. Ariceaga Navarro testified Montemayor provided accounting services to the American company but not the Mexican company, specifically profit and loss reports, balance sheets, payroll reports, bank account conciliations, financial

statements, and annual reports. She testified she worked with de la Cruz and Martinez Apolinar but did not directly receive information on the company's internal Excel spreadsheets from Covarrubias-Montes. She confirmed with "the person who provide[d] . . . all the information of the employees" that Covarrubias-Montes's salary was authorized. She testified she was first contacted to testify by Covarrubias-Montes but was never contacted by the State, by law enforcement, or by the Castañedas. She further testified Montemayor accounting did not review individual checks and she had no knowledge of whether Covarrubias-Montes stole money from the American company.

### C. Analysis

Here, mindful of the standard of review set out above, a comparison of the evidence produced at trial to the essential elements of the offense as defined by the hypothetically correct jury charge shows a rational juror could have found beyond a reasonable doubt that Covarrubias-Montes unlawfully appropriated "assorted merchandize, including U.S. Currency"—valuing greater than $2,500 but less than $30,000—by writing, signing, and cashing unauthorized checks in her name with the intent to deprive Castañeda Gonzalez of those funds. *See Lang*, 664 S.W.3d at 174–75; *Baltimore*, 689 S.W.3d at 341–42. Specifically, the jury could have found beyond a reasonable doubt Covarrubias-Montes wrote, signed, and cashed checks to herself on the American and Mexican companies IBC bank accounts for salary increases, bonuses, loans, and advances for more than $2,500. The jury could have further found beyond a reasonable doubt those checks required authorization from Castañeda Gonzalez or Castañeda Rivero, and the Castañedas never authorized them. And the jury could have also concluded, based on the checks admitted into evidence, Covarrubias-Montes never repaid any of those unauthorized funds she secured through the checks, resulting in unlawful appropriation of the funds. The evidence is therefore sufficient

to uphold her theft conviction. *See* TEX. PENAL CODE § 31.03(a); *Lang*, 664 S.W.3d at 174–75. Accordingly, Covarrubias-Montes's sufficiency challenge is overruled.

## ARTICLE 39.14 DISCOVERY AND MISTRIAL

Covarrubias-Montes argues the trial court violated her rights under Article 39.14 of the Texas Code of Criminal Procedure by (1) failing to require the State to conduct a thorough investigation into the records of third parties to obtain all material and exculpatory evidence and to produce that evidence to her and (2) overruling her motion for mistrial without the benefit of undelivered, potentially exculpatory evidence discussed at trial during the cross-examination of Eduardo Castañeda Rivero.

### A. The Pretrial Status Hearings

Between June 2021 and February 2022, the parties addressed discovery via three motions and at least eight hearings. On June 4, 2021, Covarrubias-Montes filed a "motion for discovery, inspection, and disclosure of favorable evidence" pursuant to Article 39.14, seeking exculpatory evidence in the State's possession, custody, or control. *See* TEX. CODE CRIM. PROC. art. 39.14. Four days later, at a June 8 hearing, the State explained to the court that the parties "had talked about some checks and . . . some . . . ledgers" and the State planned to comply with the Michael Morton Act.[6] The State, further, agreed "to make sure that we have exactly the same thing. And then anything that we don't have that he feels he needs, we will do whatever we can do to obtain it." No ruling was sought from or provided by the trial court at that hearing.

On September 2, 2021, Covarrubias-Montes filed a second motion for discovery seeking disclosure of additional documents including 2017 through 2019 debt schedules of the American

---

[6] The Michael Morton Act refers to the bill, passed in 2013, and codified at Article 39.14 of the Texas Code of Criminal Procedure. Put simply, it requires prosecutors to disclose, upon request, all material evidence, in its possession, custody, or control and separately to disclose all exculpatory, impeachment, or mitigating documents or information, in its possession, custody, or control. *See* TEX. CODE CRIM. PROC. art. 39.14.

company. During a status hearing the following day, Covarrubias-Montes's counsel stated the parties "conferred for about two and a half hours" and agreed to meet with the complainant to address the need for additional items. Again, the trial court was not asked to rule on the motion. Instead, Covarrubias-Montes's counsel stated the parties were continuing to work together on the discovery issues and told the trial court the State had provided "a lot of stuff. They've given me so many checks; I think I'm lacking just about maybe 10 percent of [what] we've identified."

On September 30, 2021, the parties again appeared in court to address the status of discovery. The State explained it met with the complainant, was still seeking additional documents from the complainant, and was "making all the effort to try to provide" the documents identified by Covarrubias-Montes. The State explained the external bookkeeper for the complainant's companies was out of business, making the acquisition of the documents in question more difficult. Covarrubias-Montes's counsel added, "[I]n all fairness to [the State][,] . . . [t]hey've produced . . . some more documents."

In October, the trial court held additional hearings to address the status of discovery. Again, the State explained it was trying to obtain the documents requested by Covarrubias-Montes, but the complainant had not yet responded to the State's request. And, again, it raised the issue of the external bookkeeper having closed its business several years before. After Covarrubias-Montes's counsel reasserted her need for documents, such as the debt schedules, the trial court concluded "it's speculative as to whether some of these items, . . . even exist; secondly, whether they are exculpatory; and, thirdly, whether they're even within the possession of the State or subject to the State's control." Once again, Covarrubias-Montes's counsel did not request a ruling on the motion.

During a December 2, 2021 status hearing, the State explained it had produced some additional information and noted there were still outstanding items including the payroll ledger.

Covarrubias-Montes asked for payroll records from the bookkeeper's QuickBooks files, and the State indicated it would try and obtain those records and "if they produce it to us, then we'll provide that." Covarrubias-Montes's counsel informed the court the State had provided "about 90 percent" of what she requested, but she needed "100 percent." The court concluded "[t]he State [was] required to give [Covarrubias-Montes] any exculpatory evidence that's in their possession." And Covarrubias-Montes's counsel stated she would need "to have a ruling" if the State did not do so.

On January 4, 2022, Covarrubias-Montes filed a third amended motion for discovery, adding four additional categories of documents including: (1) the 2016 to 2019 payroll register for the American company; (2) the "Debt Schedule or document" that reflects any debt owed by Covarrubias-Montes to the American company; (3) the 2016 to 2019 balance sheets of the American company; and (4) any documents or reports maintained by either the American or Mexican company accusing Covarrubias-Montes "of having stolen or misappropriated funds, checks, cash or any type of asset" between 2016 and 2019.

Two days later, in a status hearing addressing the discovery issues, the State explained it met with Covarrubias-Montes' counsel and the complainant to discuss the availability of records. As a result, the payroll registry was turned over to Covarrubias-Montes. Covarrubias-Montes's counsel clarified the only outstanding items were the debt schedule for the American company, showing any debt owed by Covarrubias-Montes to the company, the 2016 to 2019 balance sheets, and documents that accuse Covarrubias-Montes of misappropriation.

The State asserted the owner of the company told him "there is no debt schedule for the American company, only for the Mexican company." Covarrubias-Montes's counsel responded that if it did not exist, that was "fine." Covarrubias-Montes's counsel then pointed out the only item still outstanding was the balance sheets. The State explained it had requested the documents

from the complainant, but he had not yet produced them. The State also said it planned to provide the documents accusing Covarrubias-Montes of misappropriation the following day. The trial court ruled the State was required to turn over the balance sheets for the American company.

In February, the trial court held its final hearing addressing discovery. Covarrubias-Montes's counsel stated he had a six-hour meeting with the complainant and agreed the State had turned over the 2019 balance sheets and one year of the debt schedule. According to Covarrubias-Montes' counsel, even the State believed "there may be . . . more balance sheets" in the complainant's possession. Nevertheless, Covarrubias-Montes's counsel stated "from our perspective, I'm already satisfied with the 2019. I really don't need the others. So what I would like is if they don't have them, then they just say that they don't have them so that I won't be . . . surprised during the trial." The State confirmed it asked for the 2017 through 2019 balance sheets to be produced and was provided with 2019 only. The trial court asked whether the State had "furnished everything that they have available," to which the State responded: "Yes, Your Honor." No further order was requested, and the matter was concluded.

## B. Castañeda Rivero's Discovery Testimony

During trial on May 18, 2022, Covarrubias-Montes's counsel questioned Eduardo Castañeda Rivero regarding a document reflecting a 2016 list of employee loans created by the American company's external bookkeeper. Castañeda Rivero reviewed the list and found it had entries on it for a distribution to an employee that was misclassified as a loan by Covarrubias-Montes in her role as accounting supervisor. Covarrubias-Montes's counsel asked where the companies kept employee loan records from 2017 through 2019. Castañeda Rivero testified such records were maintained by the company's external bookkeeper. He also testified such records were in the company's internal Microsoft Excel records. When Covarrubias-Montes's counsel

explained the employee loan records were not received by Covarrubias-Montes in preparation for trial, Castañeda Rivero further testified he "suppl[ied] everything" to the State requested by Covarrubias-Montes.

Later, Covarrubias-Montes's counsel explained the importance of employee loan records for cross-referencing check numbers issued to employees to characterize them as loans. Castañeda Rivero testified that payroll checks would not show up on the employee loan list, but checks intended as loans would be properly logged as a loan. He testified that maintaining the loan list was one of Covarrubias-Montes's accounting duties, but regardless of the characterization of the transaction, Covarrubias-Montes never paid the company for the money she took from it. He further claimed the company had records proving she never paid anything back, including bank statements, showing the company was never paid back. On redirect, Castañeda Rivero testified that cross-referencing the loans with checks showed the 2016 loans list was actually inaccurate. Specifically, one of the "loans" was not identified as a loan on the check memo, another "loan" was Covarrubias-Montes's payroll, and yet another—for $807.14—was twice her payroll. He further testified the list was generated by the external bookkeeper based on information provided by Covarrubias-Montes in her accounting duties.

Two days later, on May 20, 2022, Covarrubias-Montes moved for a mistrial on the basis of Castañeda Rivero's testimony. She argued the State failed to comply with its discovery obligations because it did not require the American company to turn over the loan records, which were potentially both material and exculpatory. The State responded the motion was untimely because it was made not after Castañeda Rivero's testimony, but after the close of evidence and after several other witnesses testified. It further contended it consulted with counsel for Covarrubias-Montes on multiple occasions, turned over all documents in its possession, custody,

or control, and noted Covarrubias-Montes could have subpoenaed any additional document she sought. Moreover, the State contended that since the transactions were not authorized, no documents existed that would show otherwise. Covarrubias-Montes's counsel responded he was "neither implying nor stating that the State did not give to me anything that they had or that they withheld anything." Instead, he was arguing the State had an obligation to secure documents that were not within its possession, custody, or control but—if they actually exist—within the sole custody and control of the complainant. The trial court denied the motion, concluding the State had complied with article 39.14.

### C. Article 39.14 Discovery Violation

Covarrubias-Montes asserts the trial court abused its discretion in limiting the State's discovery obligations to evidence within its possession, custody, or control and, as a result, violated her Article 39.14 rights and her right to due process.

#### 1. Standard of Review

We review a trial court's ruling on an Article 39.14 discovery motion for an abuse of discretion. *See State v. Heath*, 696 S.W.3d 677, 702 (Tex. Crim. App. 2024); *Briscoe v. State*, 542 S.W.3d 100, 108 (Tex. App.—Texarkana 2018, pet. ref'd). "A trial court abuses its discretion if its decision lies outside of the zone of reasonable disagreement." *Heath*, 696 S.W.3d at 688–89.

#### 2. The State's Duty to Produce Evidence

Article 39.14 of the Texas Code of Criminal Procedure provides:

(a) Subject to the restrictions provided by Section 264.408, Family Code, and Article 39.15 of this Code, as soon as practicable after receiving a timely request from the defendant the state shall produce and permit the inspection and the electronic duplication, copying, and photographing, by or on behalf of the defendant, of any offense reports, any designated documents, papers, written, or recorded statements of the defendant or a witness, including witness statements of law enforcement officers but not including the work product of counsel for the state in the case and their investigators and their notes or report,

or any designated books, accounts, letters, photographs, or objects or other tangible things not otherwise privileged that constitute or contain evidence material to any matter involved in the action and *that are in the possession, custody, or control of the state or any person under contract with the state.*
. . .

(h) Notwithstanding any other provision in this article, the state shall disclose to the defendant any exculpatory, impeachment, or mitigating document, item, or information *in the possession, custody, control of the state* that tends to negate the guilt of the defendant or would tend to reduce the punishment for the offense charged.

TEX. CODE OF CRIM. PROC. art. 39.14(a), (h) (emphasis added).

"The Michael Morton Act is understood to have broadened the State's discovery obligations." *Heath*, 696 S.W.3d at 692. The Act makes "disclosure the rule and non-disclosure the exception." *Id.* (quoting *Watkins v. State*, 619 S.W.3d 265, 277 (Tex. Crim. App. 2021)) (internal quotation marks omitted). In fact, the duty to turn over exculpatory or mitigating evidence under subsection (h) exists even where the defendant makes no request for it. *See* TEX. CODE OF CRIM. PROC. art. 39.14(h); *Heath*, 696 S.W.3d at 695; *see Watkins*, 619 S.W.3d at 277. "Generally speaking, the current version of Article 39.14 removes procedural hurdles to obtaining discovery, broadens the categories of discoverable evidence, and expands the State's obligation to disclose." *Watkins*, 619 S.W.3d at 278; *see* TEX. CODE CRIM. PROC. art 39.14.

### 3. Harm Analysis

Assuming without deciding the trial court erred by not ordering the State to conduct a thorough investigation into the records of third parties to obtain all material and exculpatory evidence and produce it to Covarrubias-Montes, and assuming without deciding Covarrubias-Montes preserved such error for our review, a trial court's violation of Article 39.14 is subject to a harm analysis. *See Watkins*, 619 S.W.3d at 291; *Fortuna v. State*, 665 S.W.3d 861, 869 (Tex. App.—Houston [14th Dist.] 2023, no pet.); *Sopko v. State*, 637 S.W.3d 252, 257 (Tex. App.—Fort Worth Dec. 16, 2021, no pet.) (assuming without deciding 39.14 error, concluding error harmless).

A violation of Article 39.14 is statutory, non-constitutional error. *See Heath*, 696 S.W.3d at 692 ("According to the plain text of Article 39.14, criminal defendants now have a general statutory right to discovery in Texas beyond the guarantees of due process."); *Watkins*, 619 S.W.3d at 277 (stating same); *Fortuna*, 665 S.W.3d at 869.

For non-constitutional error, reversal is only required if the error "affect[s] an appellant's substantial rights—*i.e.*, when they have a substantial and injurious effect or influence in determining the jury's verdict." *Cook v. State*, 665 S.W.3d 595, 600 (Tex. Crim. App. 2023); *see, e.g.*, *Valadez v. State*, 663 S.W.3d 133, 147–48 (Tex. Crim. App. 2022). If, after examining the record as a whole, "we have a fair assurance . . . the error did not influence the jury, or had but a slight effect, we will not overturn the conviction." *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018). We make this determination by examining: certain "nonexclusive factors": (1) the character of the error and its connection to the other evidence; (2) "the nature of the evidence supporting the verdict"; (3) "the existence and degree of additional evidence indicating guilt"; (4) "whether the State emphasized the complained-of error"; (5) "the trial court's instructions"; (5) the defendant's "theory of the case"; and, if applicable, (6) "relevant voir dire." *Cook*, 665 S.W.3d at 599.

Here, Covarrubias-Montes characterizes the trial court's Article 39.14 error as its failure to require the State to conduct a thorough investigation into the records of third parties to obtain all material and exculpatory evidence and to produce that evidence to her for her defense. *See id.* But the multiple status hearings over six months before the trial court show the State painstakingly worked with Covarrubias-Montes *and the complainant* to secure as many documents as it could. Moreover, Covarrubias-Montes agrees the State turned over all documents in its possession,

custody, and control. *See* TEX. CODE OF CRIM. PROC. art. 39.14(a), (h) (requiring State to disclose documents, items, or information in possession, custody, or control).

Covarrubias-Montes's theory of the case was her salary increases, advances, loans, and bonuses were authorized by the owners of the company and verified through accounting controls. *See Cook*, 665 S.W.3d at 599. She contends the evidence not turned over, specifically the American company's employee loan lists for 2017 to 2019, would have supported her theory by showing she was innocent and that the checks she signed and distributed to herself were listed as loans. But the testimony regarding the 2016 loan list shows any purported loan lists from the 2017 to 2019 period would not have influenced the jury or would have, at most, had a slight effect. As Castañeda Rivero's testimony showed, the employee loan lists, like the checks at issue in the case were generated by, or under the supervision of, Covarrubias-Montes in her capacity as accounting supervisor. As a result, they were, at best, an unreliable source of employee loan information by, e.g., reflecting salary as "loans." Therefore, any additional loan lists actually had the potential risk of further undermining Covarrubias-Montes's case, including her own testimony. In other words, a reasonable juror might have found additional loan lists prepared by Covarrubias-Montes were further evidence of her guilt. *See id.* at 600.

Moreover, Covarrubias-Montes failed to take the necessary action to either ask for a continuance, ask the court to order the testifying witness to produce the documents, or to subpoena them through counsel. *See Sopko*, 637 S.W.3d at 257; TEX. CODE CRIM. PROC. art. 24.01-.03 (providing for defense discovery via subpoena). As a result, Covarrubias-Montes offers no evidence beyond a scintilla whether the documents actually exist and, if they do, what they would actually prove. And whether such evidence—even if it demonstrated the checks constituted loans—would have any weight with the jury given that they found her guilty despite other such

evidence. For example, Covarrubias-Montes elicited significant testimony in her defense to counter the State's case and to establish that the checks were authorized as approved salary raises, salary advances, bonuses, and repaid loans. Specifically, Martinez Apolinar testified salary increases, bonuses, and loans to Covarrubias-Montes were accounted for by the companies, and Covarrubias-Montes occasionally made payment on her advances by depositing funds in the bank instead of through payroll deductions. These payments, she further testified, were verified through the debt schedule. She also testified each of Covarrubias-Montes's checks presented by the State were authorized by the company. Ariceaga Navarro also testified Covarrubias-Montes's salary was authorized. Accordingly, any such additional evidence would have provided nothing more than what was already admitted through the testimony of two of Covarrubias-Montes's witnesses—testimony the jury apparently did not credit. *See Branum v. State*, 535 S.W.3d 217, 226 (Tex. App.—Fort Worth 2017, no pet.) (concluding no harm where witnesses testified to same facts, rendering nonproduction of out of court statement harmless). Instead, the jury could have found more credible the evidence that established that the raises, advances, bonuses, and loans she gave herself were not authorized and that she never made any payments to the company in satisfaction of them.

Furthermore, the existence and degree of additional evidence indicating guilt was significant. *See Cook*, 665 S.W.3d at 599. Among other things, the State introduced more than 130 exhibits showing checks and deposit slips reflecting unauthorized salary increases, bonuses, advances, and loans totaling at least $28,000. Castañeda Gonzalez, Paola Castañeda, and Castañeda Rivero all testified Covarrubias-Montes's actions were unauthorized. And Castañeda Rivero specifically testified a comparison of the checks for loans and advances on salary with the corresponding payroll checks showed no deductions for payments of loans or advances made to

Covarrubias-Montes in subsequent checks. Castañeda Rivero also testified no money was ever deposited in the company's bank accounts by Covarrubias-Montes to make payment on the loans or advances. In addition, Covarrubias-Montes herself testified she was aware of the $24,000 in missed IBC Bank commercial loan payments by the American company—an amount roughly correlating to the amount Detective Salazar testified he estimated Covarrubias-Montes unlawfully appropriated. Covarrubias-Montes has failed to show that any additional record evidence addressing employee loans would significantly tip the jury's impression of Covarrubias-Montes's guilt in a manner favorable to her case, having already heard similar evidence and the significant evidence of guilt presented by the State. *See Fortuna*, 665 S.W.3d at 869.[7]

Accordingly, we cannot conclude that the failure to disclose the loan records, even if they did demonstrate that the checks at issue were listed as "loans," would have influenced the jury or had more than a slight effect on the outcome of the trial. *See Gonzalez*, 544 S.W.3d at 373. As a result, any such error is harmless. *See Cook*, 665 S.W.3d at 600.[8]

---

[7] Turning to the jury charge factor, the trial court instructed the jury that "[t]he evidence consists of the testimony and exhibits admitted in the trial. You must consider only evidence to reach your decision. You must not consider, discuss[,] or mention anything that is not evidence in the trial." *See id.* In spite of this instruction, Covarrubias-Montes's counsel repeatedly emphasized during closing the State's failure to produce evidence. The State responded by arguing Covarrubias-Montes's counsel could have subpoenaed the record evidence. Covarrubias-Montes's counsel objected, the trial court instructed the State not to discuss it further, and it instructed the jury to disregard the State's comments. *See Gonzalez*, 544 S.W.3d at 373.

[8] Covarrubias-Montes also contends the trial court's error in discovery violated her right to due process, due course of law, and Rule 3.09(d) of the Texas Disciplinary Rules of Professional Conduct. However, Covarrubias-Montes did not timely raise these objections during her trial, and they are therefore not preserved for our review. *See* TEX. R. APP. P. 33.1 (to preserve complaint for appellate review, record must show complaint made to trial court by timely request, objection, or motion stating grounds); *Pena v. State*, 285 S.W.3d 459, 463–65 (Tex. Crim. App. 2009) (reversing court of appeals error in finding appellant preserved complaint regarding due course of law where record showed purported error not preserved); *Yazdchi v. State*, 428 S.W.3d 831, 844 (Tex. Crim. App. 2014) (concluding failure to object at trial may waive due process errors); *see also Colone v. State*, 573 S.W.3d 249, 260 (Tex. Crim. App. 2019) (defendant may not raise matter for first time in new trial motion if he had opportunity to raise it at trial).

## D. The Motion for Mistrial

Covarrubias-Montes also contends the trial court abused its discretion in overruling her motion for mistrial, explaining the case should not have been submitted to the jury without the benefit of exculpatory evidence that may or may not exist and which may or may not support her case. Covarrubias-Montes waited until after the close of evidence in its entirety to make her motion for mistrial.[9] In the motion, Covarrubias-Montes did not assert the State had withheld exculpatory information in its possession, but that it should have obtained the evidence requested by Covarrubias-Montes from Castañeda Rivero—going again, to her claim the State violated the Michael Morton Act.

We review a trial court's denial of a mistrial for an abuse of discretion. *See, e.g.*, *Becerra v. State*, 685 S.W.3d 120, 127 (Tex. Crim. App. 2024). A motion for mistrial must be both timely and specific. *Griggs v. State*, 213 S.W.3d 923, 927 (Tex. Crim. App. 2007); *see, e.g.*, *Gonzalez v. State*, 616 S.W.3d 585, 591 (Tex. Crim. App. 2020). "A motion for mistrial is timely only if it is made as soon as the grounds for it become apparent." *Griggs*, 213 S.W.3d at 927.

Here, Covarrubias-Montes's motion was specific, but it was untimely. *See Griggs*, 213 S.W.3d at 927; *Gonzalez*, 616 S.W.3d at 591. As Covarrubias-Montes's counsel explained, the grounds for the motion became apparent during the testimony of Castañeda Rivero two days before the motion for mistrial was made and again during the testimony of Martinez Apolinar the previous day. *See Griggs*, 213 S.W.3d at 927 (concluding court of appeals erred in addressing mistrial issue on appellate review where appellant waited until after next witness concluded testimony to move for mistrial). Because Covarrubias-Montes failed to make a timely motion for mistrial, we cannot conclude she preserved error on this issue for appeal, and we overrule this issue.

---

[9] Six witnesses were presented by the defense after Castañeda Rivero testified.

**MOTION FOR NEW TRIAL**

Covarrubias-Montes contends the trial court abused its discretion and committed reversible error when it denied her motion for new trial when it (1) relied on an erroneous interpretation of Article 40.01 of the Texas Code of Criminal Procedure requiring she support such a motion with an affidavit presenting newly discovered evidence and (2) refused to consider her new trial motion pursuant to Rule 21.3(e) of the Texas Rules of Appellate Procedure.

### A. Standard of Review and Law

We review a trial court's denial of a motion for new trial for an abuse of discretion. *Becerra v. State*, 685 S.W.3d 120, 127 (Tex. Crim. App. 2024). In such a review, we will view the evidence in the light most favorable to the trial court's ruling. *Int'l Fid. Ins. Co. v. State*, 586 S.W.3d 9, 12 (Tex. Crim. App. 2019). Only when no reasonable view of the record could support the ruling will we find an abuse of discretion. *Id.*

Under Rule 21.3(e), a defendant "must be granted a new trial" (1) if "a material defense witness has been kept from court by force, threats, or fraud"; or (2) if "evidence tending to establish the defendant's innocence has been intentionally destroyed or withheld, thus preventing its production at trial." TEX. R. APP. P. 21.3(e). A new trial shall also be granted if "material evidence favorable to the accused has been discovered since trial." TEX. CODE CRIM. PROC. art. 40.001. An Article 40.001 motion is "not favored by appellate courts" and is "viewed with great caution." *Olmos v. State*, 693 S.W.3d 474, 481 (Tex. App.—Houston [14th Dist.] 2023, pet. ref'd). To obtain Article 40.001 relief, a defendant must show:

(1) the newly discovered evidence was unknown or unavailable to the defendant at the time of trial;

(2) the defendant's failure to discover or obtain the new evidence was not due to the defendant's lack of due diligence;

(3) the new evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and

(4) the new evidence is probably true and will probably bring about a different result in a new trial.

*State v. Arizmendi*, 519 S.W.3d 143, 149 (Tex. Crim. App. 2017); *Hamilton v. State*, 563 S.W.3d 442, 448 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd). A failure to establish any of these requirements supports the trial court's denial of the motion. *Olsen v. State*, 606 S.W.3d 342, 352 (Tex. App.—Houston [1st Dist.] 2020, no pet.).

A motion for new trial must be supported by an affidavit or other evidence specifically setting out the factual basis for the relief sought. *Hobbs v. State*, 298 S.W.3d 193, 199 (Tex. Crim. App. 2009); *Walker v. State*, 651 S.W.3d 7, 12 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd); *see* TEX. R. APP. P. 21.7 (providing "court may receive evidence by affidavit or otherwise"). Although "a defendant need not plead a prima facie case in his motion for new trial," or "reflect each and every component legally required to establish relief," "he must at least allege sufficient facts that show reasonable grounds to demonstrate that he could prevail." *Hobbs*, 298 S.W.3d at 199–200, 201–02.

The trial court may make oral or written findings of fact when ruling on a motion for new trial. TEX. R. APP. P. 21.8; *Ruffins v. State*, 691 S.W.3d 166, 187 (Tex. App.—Austin 2024, no pet.) ("By use of the word 'may,' the rule authorizes—but does not require—a trial court to make oral or written findings when ruling on a motion for new trial." (quoting *Thomas v. State*, 445 S.W.3d 201, 214 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd)) (internal quotation marks omitted)). But in the absence of such findings, we will presume the trial court made all findings that support its ruling. *Okonkwo v. State*, 398 S.W.3d 689, 694 (Tex. Crim. App. 2013).

In its consideration of a new trial motion, "[a] trial court is not bound to believe a particular fact unless it is conclusively established." *Najar v. State*, 618 S.W.3d 366, 372 (Tex. Crim. App.

2021). And, if there are two plausible ways to view the evidence, we will not disturb the trial court's right to determine the one to believe. *Id.*

## B. The Motion for New Trial and the Hearing

Covarrubias-Montes moved for a new trial pursuant to Article 40.001 of the Texas Code of Criminal Procedure and Rule 21.3(e) of the Texas Rules of Appellate Procedure.[10] She contended she was denied due process under the United States Constitution when the trial court did not require the State to conduct an investigation to discover exculpatory evidence under the control of the owner of the American company. She clarified, however, she was not suggesting "the prosecution is further obligated to conduct searches or investigations for favorable evidence of which they are unaware." In support, she again pointed to Castañeda Rivero's testimony regarding documents. She argued this was material evidence favorable to the accused that had been discovered since trial. But no such evidence was attached to the motion for new trial and neither party contends they are in possession of such evidence.

Her affidavit accompanying the motion states "the accusers' own documents generated by its accounting and fiscal processes would make it impossible" for her to defraud the company. *See Hobbs*, 298 S.W.3d at 199; Tex. R. App. P. 21.7. She explained "she made . . . deposits for payment of her loans directly into her accuser's bank account with the Eagle Pass Branch of IBC at the time she cashed her regular check" and argued those deposits "should also be documented" by the American company in its "internal record-keeping systems" managed by Martinez Apolinar and with the external bookkeeper, Ariceaga Navarro per their trial testimony.

---

[10] A little over a week after filing her motion for new trial and affidavit, she filed a "First Amended and Supplemented Motion for New Trial." Because the amended motion and affidavit include everything in the original motion and affidavit, all references herein are to the amended motion.

On September 19, 2022, the trial court held a hearing on the new trial motion and asked whether Covarrubias-Montes had newly discovered evidence showing she was not provided exculpatory evidence. Covarrubias-Montes's counsel contended "there was some evidence there. We requested it. The State did not request it of the accuser. Therefore, I was denied due process of law." She later admitted she did receive "new" documents from the State but explained they "make no sense" and "help[] nothing." The trial court explained that if the evidence was not exculpatory, then there would be no denial of due process, and that without the specific evidence being identified there was no way to conclude that it was, in fact, exculpatory.

Covarrubias-Montes's counsel then disclaimed the Article 40.01 new evidence basis for her new trial motion, explaining the legal issue was whether she was denied due process because the State had access to evidence from a third party not provided to Covarrubias-Montes and could have requested it. After the trial court asked again about the basis of her motion, Covarrubias-Montes's counsel explained it was "[u]sually" based on newly discovered evidence and added "[t]his is not newly discovered evidence" and she "first learned that evidence exists regarding bookkeeping on these type of checks that are accused of being theft . . . during the trial."

After argument, the trial court ruled:

[Covarrubias-Montes] has failed to show that there's material evidence that was favorable to the accused that has been discovered since the trial. The Court further finds there was sufficient evidence from which the jury could have reasonably reached the conclusion and the outcome in which it did and that the jury was free to believe or disbelieve any part of the testimony as the jury deemed appropriate. Therefore, the motion for new trial is overruled.

On September 21, 2022, the trial court issued an order denying the motion for new trial.

Covarrubias-Montes then moved for reconsideration, deemphasizing her "newly discovered evidence" argument and focusing on her argument that evidence was intentionally withheld, preventing its production at trial because the State had access to documents in the

possession of the complainant that were not produced. She further argued this affected her substantial rights. After a brief hearing on the motion, the trial court overruled it.

### C. Analysis

Here, viewing the evidence in the light most favorable to the trial court's ruling, and mindful the trial court is the exclusive judge of the credibility of the evidence, we cannot conclude no reasonable view of the record could support its ruling. *See Burch*, 541 S.W.3d at 820; *Najar*, 618 S.W.3d at 372. Covarrubias-Montes plainly conceded she offered no newly discovered evidence to support the article 40.001 basis of her motion. *See Arizmendi*, 519 S.W.3d at 149 (providing defendant must show newly discovered evidence on article 40.001 motion). As the trial court observed, Covarrubias-Montes failed to provide any evidence to support her motion that would establish her innocence or bring about a different result at trial. *See Horne v. State*, 554 S.W.3d 809, 814–15 (Tex. App.—Waco 2018, pet. ref'd) (holding no abuse of discretion, explaining "[w]hat Horne did not attempt to establish in the motion for new trial was what files the jump drive provided to him actually contained, which would have provided some mechanism for the trial court and ultimately this Court to review Horne's contentions"); *see also* TEX. CODE CRIM. PROC. art. 40.001; TEX. R. APP. P. 21.3(e). Moreover, nothing in the record showed the State "intentionally" withheld any evidence in support of the Rule 21.3(e) basis of her motion. *See* TEX. R. APP. P. 21.3(e) (providing defendant must be granted new trial if evidence tending to establish defendant's innocence has been intentionally withheld). Indeed, the record shows the State produced everything in its possession. *See* TEX. CODE CRIM. PROC. art. 39.14(a), (h). Covarrubias-Montes even met with Eduardo Castañeda Gonzalez and had an opportunity to request documents herself. *Cf.* TEX. R. APP. P. 21.3(e) (providing defendant must be granted new trial if material defense witness has been kept from court by force, threats, or fraud).

Accordingly, Covarrubias-Montes's contention the trial court abused its discretion by denying her motion for new trial is overruled.[11]

## INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, Covarrubias-Montes argues her conviction should be reversed because counsel rendered ineffective assistance by failing to (1) file a motion to quash the indictment and (2) conduct independent discovery. We disagree.

### A. Standard of Review and Law on Ineffective Assistance of Counsel.

We review ineffective assistance of counsel claims under the well-established standard in *Strickland v. Washington*. 466 U.S. 668 (1984). Such Sixth Amendment claims "involve[] a two-pronged test: (1) whether counsel was deficient, and (2) whether the defendant suffered prejudice as a result of counsel's error." *Hart v. State*, 667 S.W.3d 774, 781 (Tex. Crim. App. 2023) (citing *Strickland*, 466 U.S. at 687).

To establish counsel's actions were deficient, Covarrubias-Montes must show, by a preponderance of the evidence, her counsel's actions "fell below an objective standard of reasonableness." *Hart*, 667 S.W.3d at 781. She "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (quoting *Strickland*, 466 U.S. at 689) (internal quotation marks omitted). We will look to her assertions through the lens of a reasonable counsel's actions at the time of the actions, not through hindsight. *Hart*, 667 S.W.3d at 782. Finally, we will take into account all of the circumstances to determine if counsel's decisions fall outside the wide range of professionally competent assistance. *Id.*

---

[11] Covarrubias-Montes includes a brief reference to the violation of her right to due process when she identifies the "issue presented." *See* TEX. R. APP. P. 38.1(f). However, she makes no argument addressing it in the body of the brief, much less one with "appropriate citations to authorities and to the record." *See* TEX. R. APP. P. 38.1(i). Covarrubias-Montes therefore presents nothing for our review on the issue. *See Lucio v. State*, 351 S.W.3d 878, 898 (Tex. Crim. App. 2011) (holding that appellant's point of error was "inadequately briefed and presents nothing for review as this Court is under no obligation to make appellant's arguments for her").

To show prejudice, Covarrubias-Montes must show there is "a reasonable probability" that, but for her counsel's actions or omissions, the result of the trial would have been different. *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*; *see Compton v. State*, 666 S.W.3d 685, 715 (Tex. Crim. App. 2023) (citing *Strickland*, 466 U.S. at 694). Failure to show either deficient performance or prejudice defeats an ineffective assistance of counsel claim. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

Moreover, "[c]laims of ineffective assistance must be firmly rooted in the record." *Hart v. State*, 667 S.W.3d 774, 782 (Tex. Crim. App. 2023). "Under most circumstances, the record on direct appeal will not be sufficient to show that counsel's representation was so deficient and so lacking in tactical or strategic decision-making as to overcome the strong presumption that counsel's conduct was reasonable and professional." *Id.* (quoting *Scheanette v. State*, 144 S.W.3d 503, 510 (Tex. Crim. App. 2004)) (internal quotation marks omitted). Because trial counsel should be afforded an opportunity to explain his decisions, actions and omissions, where that opportunity has not been provided we will "assume a strategic motive if any can be imagined" and will find a deficiency "only if the conduct was so outrageous that no competent attorney would have engaged in it." *Hart*, 667 S.W.3d at 782 (quoting *Okonkwo*, 398 S.W.3d at 693); *Johnson v. State*, 624 S.W.3d 579, 586 (Tex. Crim. App. 2021) ("Counsel gets the benefit of the doubt from a silent record, and courts must assume that counsel had a strategy if any reasonably sound strategic motivation can be imagined.").

## B. Failure to Move to Quash the Indictment

Covarrubias-Montes argues trial counsel's performance was ineffective because trial counsel did not file a motion to quash the indictment, resulting in—she contends—an inability to

understand "the specific nature, circumstances, and supporting evidence of [her alleged] malfeasance" in drafting and signing checks. She argues counsel's failure to file the motion resulted in her forfeiting discovery needed to prove why company operations, accounting, and fiscal records were relevant to mount a proper defense. She also contends counsel's actions constituted prejudice because the indictment "while not facially defective," was not "congruent with the unusual nature of her conduct."

### 1. Deficiency Analysis

Although Covarrubias-Montes filed a motion for new trial, she did not allege therein ineffective assistance of counsel. And counsel has not been afforded an opportunity to explain his conduct before being denounced as ineffective. *See Hart*, 667 S.W.3d at 782. We must therefore assume a strategic motive if any can be imagined and find counsel's performance deficient only if the conduct was so outrageous no competent attorney would have engaged in it. *Id.*

### a. The Notice Required by an Indictment and Whether Penal Code § 31.03 is Sufficiently Descriptive

Whether an indictment provides sufficient notice presents a question of law. *State v. Zuniga*, 512 S.W.3d 902, 906 (Tex. Crim. App. 2017). Both federal and state constitutions require "[t]he charging instrument [to] convey sufficient notice to allow the accused to prepare a defense." *Id.* (quoting *Curry v. State*, 30 S.W.3d 394, 398 (Tex. Crim. App. 2000)) (internal quotation marks omitted); U.S. CONST. amend. VI; Tex. Const. art. 1, § 10; Tex. Const. art. V, § 12b. Chapter 21 of the Texas Code of Criminal Procedure provides legislative guidance concerning the requirements and adequacy of notice within a charging instrument. *Zuniga*, 512 S.W.3d at 906.

"Article 21.02 sets out what facts must be included in an [indictment] and states, in part, that '[t]he offense must be set forth in plain and intelligible words.'" *Id.* (second alteration in original) (quoting TEX. CODE CRIM. PROC. art. 21.02(7)). "Everything should be stated in an

indictment which is necessary to be proved." TEX. CODE CRIM. PROC. art. 21.03. An indictment is "deemed sufficient" if it "charges the commission of the offense in ordinary and concise language in such a manner as to enable a person of common understanding to know what is meant, and with that degree of certainty that will give the defendant notice of the particular offense with which he is charged." TEX. CODE CRIM. PROC. art. 21.11.[12]

The Texas Court of Criminal Appeals has "recognized that in most cases a charging instrument that tracks the statutory text of an offense is sufficient to provide a defendant with adequate notice." *Zuniga*, 512 S.W.3d at 907. However, "this rule applies only where the [pleading] is framed under a statute which defines the act constituting the offense in a manner that will inform the accused of the nature of the charge." *State v. Jarreau*, 512 S.W.3d 352, 354 (Tex. Crim. App. 2017) (alteration in original) (quoting *State v. Mays*, 967 S.W.2d 404, 406 (Tex. Crim. App. 1998)) (internal quotation marks omitted); *see Zuniga*, 512 S.W.3d at 909 (stating same).

But there are cases in which tracking the statutory language is not enough to provide adequate notice. *Zuniga*, 512 S.W.3d at 907. This is so when, for example: (a) a statute uses an undefined term of variable meaning, or (b) where a statute defines the manner or means of commission in several alternative ways. *Id.*; *see State v. Barbernell*, 257 S.W.3d 248, 255 (Tex. Crim. App. 2008).

As a result, the Court of Criminal Appeals' guidance on notice in an indictment requires us to engage in a two-step analysis. *Zuniga*, 512 S.W.3d at 907. First, we must look to the elements of the offense and determine whether the statutory language is sufficiently descriptive of the charged offense. *Id.*; *see Jarreau*, 512 S.W.3d at 354–55. Second, we must determine whether the

---

[12] "A count is sufficient if any one of its paragraphs is sufficient. An indictment, information, or complaint is sufficient if any one of its counts is sufficient." *Id.* art. 21.24(c).

statute provides "alternative manners or means in which the act or omission can be committed" and, if so, whether the indictment alleges the specific manner and means of commission the State will rely upon at trial. *Zuniga*, 512 S.W.3d at 907 (quoting *Barbernell*, 257 S.W.3d at 255).

Covarrubias-Montes was charged with theft under Texas Penal Code section 31.03(a). A person commits the offense of theft if that person "unlawfully appropriates property with intent to deprive the owner of property." TEX. PENAL CODE § 31.03(a). To "appropriate" is "(A) to bring about a transfer or purported transfer of title to or other nonpossessory interest in property, whether to the actor or another; or (B) to acquire or otherwise exercise control over property other than real property." *Id.* § 31.01(4). "Deprive" is defined as (1) "to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner," (2) "to restore property only upon payment of reward or other compensation," or (3) "to dispose of property in a manner that makes recovery of the property by the owner unlikely." *Id.* § 31.01(2). And "property" means "(A) real property, (B) tangible or intangible personal property including anything severed from land; or (C) a document, including money, that represents or embodies anything of value." *Id.* § 31.01(5).

Texas Penal Code section 31.03 further provides "[a]ppropriation of property is unlawful if . . . it is without the owner's effective consent." TEX. PENAL CODE § 31.03(b). "Effective consent" is defined as including "consent by a person legally authorized to act for the owner." *Id.* § 31.01(3). Consent is not effective if, among other things, (A) it is "induced by deception or coercion," (B) "given by a person the actor knows is not legally authorized to act for the owner," (C) given by a person "known by the actor to be unable to make reasonable property dispositions," (D) "given solely to detect the commission of an offense," or (E) "given by a person who by reason of advanced age" has "diminished capacity." *Id.* § 31.01(3)(A)–(E).

Such an offense constitutes a state jail felony if the value of the property stolen is $2,500 or more but less than $30,000. *Id.* § 31.03(e)(4)(A). Further, "[w]hen amounts are obtained in violation of this chapter pursuant to one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one offense and the amounts aggregated in determining the grade of the offense." *Id.* § 31.09. In other words, if "the thefts [are] alleged to have occurred pursuant to a single scheme or continuing course of conduct, the conduct may be considered as one offense and the amounts aggregated." *Kent v. State*, 483 S.W.3d 557, 560 (Tex. Crim. App. 2016).[13] "[U]nder Section 31.09, the indictment need not allege the specific acts of theft." *Id.* at 561 (citing TEX. PENAL CODE §31.09). Moreover, "[w]hen a defendant is charged with theft in an aggregated amount pursuant to one scheme or continuing course of conduct, the state is not required to prove each individual appropriation." *Id.* "The evidence will be sufficient if the state proves that the defendant 'illegally appropriated enough property to meet the aggregated value alleged.'" *Id.* (quoting *Eastep v. State*, 941 S.W.2d 130, 135 (Tex. Crim. App. 1997)).

### b. Whether the Indictment Provides Adequate Notice

Here, a charging instrument tracking the statutory language of Section 31.03 addressed above would be insufficient to provide a defendant with adequate notice because the statutory language fails to be sufficiently descriptive by offering alternative ways in which the offense may be committed. *See Zuniga*, 512 S.W.3d at 907. It therefore requires more specific pleading to notify the defendant of the nature of the charges so as not to fail for lack of specificity. *See id.*

However, the indictment at issue goes beyond the statutory language. It provides in full:

---

[13] Section 31.09 shows the Legislature intended to "treat the 'scheme or continuing course of conduct' as the culpable criminal behavior rather than each individual theft used to prove the scheme or course of conduct." *Id.* at 561 (quoting TEX. PENAL CODE § 31.09).

THE GRAND JURY of Maverick County, State of Texas, duly organized at the JULY Term, A.D. 2020, of the District Court of said County, in said court at said term do present that SYLVIA COVARRUBIAS MONTES, hereinafter styled Defendant, from on or about the 4th day of January A.D. 2017, through on or about the 3rd day of March A.D. 2019 and before the presentment of this Indictment, in the County and State aforesaid, did then and there *unlawfully appropriate, by acquiring or otherwise exercising control over, property, other than real property, to-wit: assorted merchandize, including U.S. Currency, of an aggregate value of $2,500 or more but less than $30,000,* from Eduardo Castañeda [Gonzalez], the owner thereof, *without the effective consent of the owner*, namely Eduardo Castañeda [Gonzalez], by deception, and with intent to deprive the owner of the property, *and all of said property was appropriated pursuant to one scheme or continuing course of conduct*. (emphasis added)

As Covarrubias-Montes concedes, the indictment is "not facially defective." The indictment goes beyond the statutory language and plainly provides the statutory elements of theft by identifying Covarrubias-Montes as the person who, with the intent to deprive the owner of the property, unlawfully appropriated the property. *See* TEX. PENAL CODE § 31.03(a); *Lang v. State*, 664 S.W.3d 155, 166 (Tex. Crim. App. 2022). Furthermore, the indictment explains that by appropriation it means "to acquir[e] or otherwise exercise[e] control over" Castañeda Gonzalez's property. *See* TEX. PENAL CODE § 31.01(4); *Zuniga*, 512 S.W.3d at 907. The indictment clarifies Covarrubias-Montes intended to deprive Castañeda Gonzalez of his property, specifically money. *See* TEX. PENAL CODE § 31.01(2), (5); *Zuniga*, 512 S.W.3d at 907. The indictment also specifies the appropriation was unlawful because it was without the effective consent of the owner—Castañeda Gonzalez. *See* TEX. PENAL CODE § 31.01(3), 31.03(b); *Zuniga*, 512 S.W.3d at 907. Furthermore, the indictment alleges Castañeda Gonzalez did not provide effective consent because he was deprived of his property through deception. *See* TEX. PENAL CODE § 31.01(3)(A); *Zuniga*, 512 S.W.3d at 907. The indictment also identifies the amount involved as $2,500 or more but less than $30,000, tracking the statutory language for a state jail felony. *See* TEX. PENAL CODE § 31.03(e)(4); *Zuniga*, 512 S.W.3d at 907. And, finally, it clarifies this is an aggregation of

property pursuant to one scheme or course of conduct. *See* TEX. PENAL CODE § 31.09; *Zuniga*, 512 S.W.3d at 907; *Kent*, 483 S.W.3d at 560–61.

Although Covarrubias-Montes may have wanted an order from the trial court that more specifically provided "notice of the specific nature, circumstances, and supporting evidence" of her charged crime, she was provided with adequate notice in the indictment. This is supported by the fact that counsel submitted a detailed list of accounting records he wished the State to procure from the complainant. Therefore, we can imagine counsel's strategic motive in not challenging the indictment was because it provided adequate notice. *See Hart*, 667 S.W.3d at 782; *Johnson*, 624 S.W.3d at 586. Accordingly, we cannot conclude counsel's actions were deficient. *See Strickland*, 466 U.S. at 687; *Hart*, 667 S.W.3d at 781.

### 2. Prejudice Analysis

Even assuming trial counsel's failure to move to quash the indictment was deficient, we cannot conclude there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694. Article 21.19 of the Code of Criminal Procedure provides "[a]n indictment shall not be held insufficient, nor shall the trial, judgment or other proceedings thereon be affected, by reason of any defect of form which does not prejudice the substantial rights of the defendant." TEX. CODE CRIM. PROC. art. 21.19; *see Buxton v. State*, 526 S.W.3d 666, 678 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) ("A complaint that an indictment fails to provide adequate facts to give notice of the offense that he is charged with is a complaint about a defect in form." (citing *Olurebi v. State*, 870 S.W.2d 58, 61 (Tex. Crim. App. 1994)); *see also Hines v. State*, 608 S.W.3d 354, 373–4 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (same). Moreover, if a defendant's motion to quash is overruled, the defendant "suffered no harm unless he did not, in fact, receive notice of the State's theory against

which he would have to defend." *Smith v. State*, 297 S.W.3d 260, 267 (Tex. Crim. App. 2009) (concluding appellant's substantial rights not harmed where record clearly showed appellant had actual notice of capital charge upon which State was basing allegations). The State may meet its obligation during pre-trial discovery if it provides "documentation of the unauthorized transactions on which it intends to rely at trial." *Hines*, 608 S.W.3d at 371; *Kellar v. State*, 108 S.W.3d 311, 313 (Tex. Crim. App. 2003) ("However, this due process requirement may be satisfied by means other than the language in the charging instrument.").

Here, Covarrubias-Montes does not identify how her substantial rights were affected other than to vaguely contend the failure to file the motion stopped her from securing more discovery and information to mount a proper defense. Yet, her counsel was able to provide a detailed list of documents she requested from the complainant's companies in order to prepare her defense. Covarrubias-Montes agreed the State produced all the discovery in its possession, custody, and control, explaining she was "satisfied" with the State's document production. Indeed, the record shows the State worked with Covarrubias-Montes in pre-trial discovery for more than six months to ensure it produced all the documentation of unauthorized transactions it intended to rely on at trial. And, in addition, the State arranged for Covarrubias-Montes' counsel to have six hours of time with the complainant to ask for additional information.

The record also shows the State worked to secure all documents requested by Covarrubias-Montes, and Covarrubias-Montes explained she had received "about 90 percent" of what she requested. The State produced, among other things, the checks at the center of the alleged criminal activity, a debt schedule, the payroll registry for the American company, the 2019 balance sheets, Texas Workforce Commission employer reports, and IRS Form 941s. *See Hines*, 608 S.W.3d at 371 (concluding appellant had sufficient notice of acts State was relying upon to prove

misapplication of fiduciary property because it produced banking and business records from several businesses that allegedly received funds); *see Kellar*, 108 S.W.3d at 313–14 (concluding constitutional notice was adequate where State produced records focused on individual transactions to demonstrate the alleged theft).

Because Covarrubias-Montes has not shown a motion to quash would have been meritorious, she has not established that, but for her counsel's failure to move to quash the indictment, the outcome of her trial would have been different. Accordingly, her first contention of ineffective assistance is overruled.

## C. Failure to Conduct Discovery

Covarrubias-Montes also asserts her trial counsel's performance was ineffective because trial counsel did not exercise his duty to conduct his own investigation to find exculpatory evidence. We disagree.

### 1. Deficiency Analysis

#### a. The Law

"One necessary facet of professional assistance is the investigation of the facts and law applicable to a case." *Ex parte Dennis*, 665 S.W.3d 569, 574 (Tex. Crim. App. 2022). In every case, counsel has "a duty to make a reasonable investigation or a reasonable decision that an investigation is unnecessary." *Id.* "[A] reviewing court must consider the quantum of evidence already known to counsel and whether the known evidence would lead a reasonable attorney to investigate further." *Ex parte LaHood*, 401 S.W.3d 45, 50 (Tex. Crim. App. 2013) (quoting *Ex parte Martinez*, 195 S.W.3d 713, 721 (Tex. Crim. App. 2006)) (internal quotation marks omitted); *Ex parte Garza*, 620 S.W.3d 801, 824 (Tex. Crim. App. 2021) ("When trial counsel does not conduct a complete investigation, his conduct is reasonable only to the extent that reasonable

professional judgments support the limitations on investigation." (quoting *Wiggins v. Smith*, 539 U.S. 510, 533 (2003)) (internal quotation marks omitted). Moreover, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Garza*, 620 S.W.3d at 809 (quoting *Wiggins*, 539 U.S. at 521–22) (internal quotation marks omitted).

### b. The Record

Here, the record shows Covarrubias-Montes's counsel conducted an investigation that relied heavily on the State's investigative relationship with Castañeda Gonzalez to secure exculpatory documents in discovery. Covarrubias-Montes's counsel focused his investigation on the business records of the complainant's Mexican and American companies as well as their external bookkeeper. Because Covarrubias-Montes was also being prosecuted in Mexico, Covarrubias-Montes's counsel pursued documents in connection with that foreign prosecution as well. After investigating Covarrubias-Montes's Mexican prosecution and securing "a pretty big package" of documents from that prosecution—and learning the foreign charges were going to be dropped—Covarrubias-Montes's counsel turned those documents over to the State, believing they would exonerate Covarrubias-Montes. The State's initial review of the documents, and its statements at the pretrial hearings thereafter, suggested the documents from the Mexican prosecution had raised questions about the American prosecution.

Covarrubias-Montes's counsel used the Mexican documents to pivot his investigation to the Maverick County case, resulting in the filing of an amended discovery motion requesting the State produce additional documents from the companies at issue. Covarrubias-Montes's counsel appeared to take this approach because of a belief the State's duty under the Michael Morton Act ensured all existing exculpatory documents would be secured and turned over by the State—rather

than just documents in the State's possession, custody, or control. During the hearings, Covarrubias-Montes's counsel also expressed his belief that only the State could secure documents from the complainant and complainant's external bookkeeper. The pretrial status hearings showed Covarrubias-Montes's counsel and the State working closely together to secure those documents from the complainant and the external bookkeeper.

The record shows the State largely complied with the discovery requests. Between pretrial hearings, there were multiple meetings between Covarrubias-Montes's counsel and the State about discovery, and at least one six-hour meeting between the complainant, Covarrubias-Montes's counsel, and the State.

Toward the end of discovery, Covarrubias-Montes's counsel focused on the lack of access to debt schedules, balance sheets, and the external bookkeeper's QuickBooks records. Covarrubias-Montes's counsel explained to the court these documents were "crucial to the defense" because the debt schedule could potentially include many line items Covarrubias-Montes "is being accused of having stolen and they have been registered as debts, debts acknowledged by [Covarrubias-Montes] to the complain[ant]." He further explained all documents produced by the external bookkeeping firm were crucial to show things like Covarrubias-Montes's salary and the procedure for raises, which would show she was not stealing from her employer. Counsel was therefore aware of the needed documents and from whom they could be obtained.

### c. Analysis

"[C]ounsel has a duty in every case to make a reasonable investigation or a reasonable decision that an investigation is unnecessary." *Dennis*, 665 S.W.3d at 574. In reviewing the record, we must consider the "quantum of evidence already known to counsel and whether the known

evidence would lead a reasonable attorney to investigate further." *LaHood*, 401 S.W.3d at 50 (quoting *Martinez*, 195 S.W.3d at 721) (internal quotation marks omitted).

There is no question Covarrubias-Montes's counsel's investigation largely consisted of using the State and its Article 39.14 obligations to locate and produce exculpatory documents. *Cf. Garza*, 620 S.W.3d at 823 (concluding counsel did not fulfill obligation to conduct thorough investigation where he almost exclusively relied on third party to locate witnesses, records, and information in mitigation investigation). Through that investigation, Covarrubias-Montes's counsel was largely successful in relying on the State's investigative relationship with the complainant to secure witnesses, records, and information.

Nevertheless, counsel must investigate the facts and law applicable to a case. *See Dennis*, 665 S.W.3d at 574. Here, counsel mistakenly believed only the State could secure documents from the complainant. And nothing in the record demonstrates Covarrubias-Montes's counsel made any effort to directly or independently attempt to secure business records from the complainant, the complainant's American company, or the external bookkeeper. *See, e.g.*, TEX. CODE CRIM. PROC. art. 24.01–.03 (providing for defense discovery via subpoena). This decision to not independently seek production of the records held by third parties is not a reasonable decision to limit the investigation. *See Garza*, 620 S.W.3d at 824. Thus, we must determine if the record demonstrates prejudice to Covarrubias-Montes as a result of the decision to rely solely on the State for production of evidence necessary for her defense.

### 2. Prejudice Analysis

To assess prejudice to Covarrubias-Montes, we determine based on the entirety of the circumstances in the record, whether there is a reasonable probability the result of the proceeding would have been different, but for counsel's failure to conduct independent discovery. *See*

*Strickland*, 466 U.S. at 694; *Garza*, 620 S.W.3d at 809; *Ex parte Andrus*, 622 S.W.3d 892, 898 (Tex. Crim. App. 2021) (requiring "a reasonable probability that at least one juror would have struck a different balance" (quoting *Andrus v. Texas*, 590 U.S. 806, 822 (2020)). Further, without a showing of "what a more in-depth investigation would have shown," Covarrubias-Montes' claim for ineffective assistance of counsel must fail. *Dennis*, 665 S.W.3d at 574.

Covarrubias-Montes points to "strong evidence of the existence of exculpatory evidence" supported by the testimony of Eduardo Castañeda Rivero, Covarrubias-Montes, and Martinez Apolinar. Although their testimony suggests there may have been other business records, nothing in the record demonstrates any additional investigation or records secured therefrom would have been exculpatory, much less that any evidence would have been found at all after the seemingly exhaustive efforts made during pretrial discovery.

Covarrubias-Montes further contends her counsel should have secured a forensic accountant to audit the American company. But she fails to demonstrate how a forensic audit would have altered the outcome of the case, particularly since the record shows Covarrubias-Montes was responsible for internal accounting records herself, meaning the jury could have chosen not to believe she properly maintained the records. In the absence of evidence of what a more in-depth investigation would have shown, Covarrubias-Montes cannot meet her burden to show counsel's performance was deficient based on counsel's investigative efforts. *See id.*; *see also Wert v. State*, 383 S.W.3d 747, 756–57 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (rejecting argument counsel should have filed discovery motions and interviewed State's witnesses because appellant failed to show evidence was not disclosed to defense counsel by State or that there was any evidence unknown and helpful to appellant which could have been uncovered by means of filing discovery motions or interviewing State's witnesses).

Accordingly, we cannot conclude Covarrubias-Montes suffered prejudice as a result of trial counsel's investigative efforts, and Covarrubias-Montes's second claim for ineffective assistance of counsel is overruled.

## CONCLUSION

Based on the foregoing, we affirm the trial court's judgment of conviction.

Lori Massey Brissette, Justice

DO NOT PUBLISH